## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SABYASACHI MOHAPATRA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 20-2594-KHV |
| DENIS MCDONOUGH, SECRETARY | ) | |
| DEPARTMENT OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Sabyasachi Mohapatra filed suit against his former employer, the United States Department of Veterans Affairs (the "VA"), alleging that it discriminated against him on the basis of race, national origin and sex, maintained a hostile work environment and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #46) filed June 17, 2022. For reasons stated below, the Court sustains defendant's motion in part and overrules it in part.

## Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry his burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251–52.

## Facts

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff, the nonmoving party.

Plaintiff is an Indian (India) male.  Defendant employed plaintiff as a Staff Gastroenterologist at the Topeka VA Medical Center from 2008 until his termination on December

18, 2015.[1]  From 2009 until his termination, plaintiff was the only full time Staff Gastroenterologist at the Topeka VA Medical Center.  He worked in the Medicine Service Line department and his job duties included performing routine and diagnostic endoscopies.

Susan Dawn Brosa (female, race unknown) was plaintiff's immediate supervisor from September 15, 2014 until the termination of his employment.  Daniel Cline (male, race unknown) was plaintiff's second level supervisor and Brosa's immediate supervisor from October of 2014 until the termination of plaintiff's employment.  Anthony Rudy Klopfer (male, race unknown) was the Executive Director/CEO of the Eastern Kansas Health Care System, which encompasses both the Topeka VA Medical Center and the VA Medical Center in Leavenworth, Kansas.  Sandeep Chhahira, an Indian male, was Acting Chief of Staff of the Topeka VA Medical Center in 2013, and Mark Peterson (male, race unknown) was Acting Chief of Staff in 2014.

Marjorie Beebe, a White female, is a General Surgeon at the Topeka VA Medical Center. At all relevant times, plaintiff and Beebe worked in different Service Lines (plaintiff in Medical, Beebe in Surgical) and had different immediate and second-level supervisors.  They both reported to the same Acting Chief of Staff and Executive Director/CEO for the overall clinic.

Dispute With Beebe

Plaintiff had a long-running disagreement with Beebe and his supervisors about whether Beebe and other surgeons in the Surgical Service Line should assist him in performing routine and diagnostic endoscopies.  In summary: (1) plaintiff's endoscopy workload was overwhelming, while Beebe's surgery workload was relatively light; (2) Beebe and other surgeons were qualified and credentialed to perform endoscopies; and (3) Beebe refused to help plaintiff perform

---

[1]     While the pretrial order stipulates that defendant terminated plaintiff's employment in February of 2016, plaintiff's notice of discharge is dated December 18, 2015.  Pretrial Order (Doc. #45) filed June 14, 2022 at 3; Discharge Letter (Doc. #51-4) at 2.

endoscopies, so he had to send more patients to private medical offices in the community, resulting in additional cost to taxpayers. Defendant permitted physicians to send patients to private offices in the community for procedures at VA expense. Defendant discouraged physicians from doing so, however, as it was a waste of resources. Exhibit A (Doc. #48-2) at 3.

On April 2, 2013, plaintiff, ten other physicians and a physician's assistant sent a letter to Chhahira (the Acting Chief of Staff) raising these complaints about Beebe. No supervisor acted upon these complaints.

Beebe complained that diagnostic endoscopies were plaintiff's job and not hers; that performing plaintiff's work interfered with her ability to perform her own surgeries; and that plaintiff's requests were inappropriate because he was not her supervisor and they were in different chains of command.

In response to plaintiff's complaints, Brosa (plaintiff's immediate supervisor) determined that surgeons in the Surgical Service Line should not routinely assist plaintiff in performing endoscopies. She had determined that diagnostic endoscopies were not a surgical skill set, as follows:

> When a Gastroenterologist does thousands of endoscopies, he/she is trained to look for changes and lesions, which allow them to do the procedure quickly and adequately. That is a better service for the veteran than a surgeon who cannot do the procedure as quickly because they are not trained to look for a lesion. Surgeons are trained to investigate a lesion when they are preparing for a procedure to remove it. They have not been trained to find an abnormality in the entire length of the colon.

Brosa Declaration (Doc. #47-3) at 3. Plaintiff disagreed and believed that surgeons were competent to perform endoscopies. Defendant does not dispute that Beebe and the other surgeons were capable of performing endoscopies. In 2014 and 2015, plaintiff repeatedly requested that

surgeons perform endoscopies for his patients, and Brosa and Cline repeatedly told him to stop asking surgeons to help. <u>Brosa Declaration</u> (Doc. #47-3) at 44, 49, 74, 75.

<u>Union Grievance And EEO Complaint</u>

On July 1, 2014, plaintiff sent a union grievance to Peterson (the Acting Chief of Staff). In his grievance, plaintiff alleged that (1) he felt "demoralized and harassed" by Beebe; (2) Beebe's behavior was "disrespectful and unfair;" (3) 11 staff members had signed a memorandum to Chhahira, the former Acting Chief of Staff on April 2, 2013 concerning Beebe's "unprofessional conduct;" (4) another surgeon in the Surgical Service Line, C. N. Krishna (male, Indian), wrote a letter to the Acting Chief stating that he had performed a disproportionate share of the surgeries in Topeka and he wanted "equal/fair treatment without favoritism;"[2] and (5) the block schedule was "biased," "established unilaterally" by Beebe and "discrimination" because "[s]ome surgeons work every day all day while others work only a few hours a week or not at all." <u>July 1, 2014 Union Grievance</u> (Doc. #47-10) at 2–3. The grievance complained that this discrimination violated Article 17, Section 1(A) of the Master Agreement with plaintiff's union, the American Federation of Government Employees ("AFGE"). <u>Id.</u> Section 1(A) of the Master Agreement provided in part that that "all employees shall be treated . . . without discrimination in regard to their political affiliation, union activity, race, color, religion, national origin, gender, sexual orientation, marital status, age, or non-disqualifying handicapping conditions." <u>Master Agreement Between</u>

---

[2]     Krishna sent the letter to Mahoua Ray, then the Associate Chief of Anesthesia and Beebe's direct supervisor, on April 11, 2014. He complained that Beebe had diverted most of the surgical workload in Topeka to him. He stated that the situation was "discriminatory and harassment by an immediate supervisor." <u>Exhibit L</u> (Doc. #48-13) at 2. The letter did not reference plaintiff.

DVA/AFGE Excerpts (Doc. #47-9) at 2.   The union did not take plaintiff's grievance to arbitration.[3]

After plaintiff filed his union grievance, White physicians who had previously been friendly became hostile.  Plaintiff stated: "They wouldn't say hello to me.  They wouldn't say good morning to me even though I said good morning."   Brosa confronted plaintiff about filing the grievance and "was angry that [he] had challenged something related to Dr. Beebe."   Exhibit A (Doc. #48-2) at 2.

Plaintiff contacted an EEO officer on May 14, 2015 and filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on July 24, 2015, alleging 13 instances of hostile work environment based on race, national origin, age and reprisal.[4]   Klopfer's office

---

[3]     The Master Agreement provided a negotiated grievance procedure and stated that employees could file a grievance for discrimination, among other things, through that grievance procedure.  Master Agreement Between DVA/AFGE Excerpts (Doc. #47-9) at 9.  The grievance procedure provided that when an employee filed a formal grievance: (1) the employee or the union would present the grievance to the immediate or acting supervisor in writing within 30 calendar days of becoming aware of the occurrence; (2) if not resolved, the grievance would be presented to the Service/Division Chief or equivalent official within seven days of the immediate supervisor's written decision letter; (3) if not resolved, the aggrieved party or the Union would submit the grievance to the Director within seven days of the decision of Step 2; and (4) if not resolved, the Union or the Department could refer the grievance to arbitration.  Plaintiff's grievance of July 1, 2014 was a Step 3 grievance.  From the record, it is unclear how or when plaintiff fulfilled Steps 1 and 2 of the grievance process.  The parties agree that they completed Step 3 and that the Union chose not to proceed to Step 4 (arbitration).

[4]     The record does not include plaintiff's initial EEOC complaint but includes a notice from the EEOC that frames his EEOC complaint as: "Whether the complainant was subjected to a hostile work environment based on race (Indian), national origin (India), age and reprisal . . . ."  Exhibit O (Doc. #48-16) at 6.  The EEOC dismissed Events 3 and 4 from plaintiff's discrimination and retaliation claims because he did not contact an EEO officer within 45 days of Events 3 and 4.  Id. at 7; see 29 C.F.R. § 1614.105(a)(1) (requiring plaintiff to contact EEO officer within 45 days of the matter alleged to be discriminatory).  It stated, however, that Events 3 and 4 were "sufficiently related to the overall pattern of harassment . . . and will be included for consideration in the analysis of the harassment claim."  Exhibit O (Doc. #48-16) at 7.  Plaintiff ultimately stipulated to the dismissal of his age discrimination claim.  Pretrial Order (Doc. #45) filed June 14, 2022 at 2.

receives notices of employee EEOC complaints.  Klopfer does not personally review each EEOC complaint, and instead designated an employee in his office, the EEO Manager to review them. Klopfer testified that his EEOC manager checked in with him about the status of EEOC charges sent to his office.

Event 1

On July 23, 2014, plaintiff informed Mark Peterson (Acting Chief of Staff) that he believed someone had hacked into his computer and "entered information into medical records for [his] patients."  Mohapatra's Responses To Defendant's Interrogatories (Doc. #47-7) at 3.  Peterson did not act on this complaint and the information in plaintiff's medical record did not change.[5]

Event 2

Plaintiff claims that during a ten-day period in September and October of 2014, he received three separate traffic citations from VA police.  While not entirely clear, it appears that plaintiff received citations for (1) having alcohol in his car; (2) speeding; and (3) not stopping at a stop sign.  Exhibit D (Doc. #48-5) at 4–7.

Sparky Edwards, Chief of the VA police, stated in a written report that he gave plaintiff a warning—not a citation—for having an unopened miniature whiskey bottle in his car on November 10, 2014.[6]  ROI Documents (Doc. #47-8) at 9–10.  Edwards said that he saw plaintiff's car parked in a restricted lot without the required decal, and when he inspected the car to look for a decal, he noticed the bottle in plain sight on a car seat.  Id.  Edwards stated that he was not aware

---

[5]     The record provides no additional information or evidence regarding this incident.

[6]     Possession of unauthorized alcohol on VA controlled property violates 38 C.F.R. § 1.218(a)(7).  While Edwards states that he issued plaintiff a warning rather than a citation in this particular incident, plaintiff specifically states that he received three citations during the time period of Event 2.  Construing all factual disputes in the light most favorable to plaintiff, the Court assumes that plaintiff received citations rather than warnings in all three incidents.

of plaintiff's union grievance and had never met plaintiff before issuing the warning.  Id. at 9–11.

The bottle was on the floor of plaintiff's car and his car windows were completely tinted so the

police must have looked through his windows with a flashlight to see the bottle.  Exhibit D (Doc.

#48-5) at 7.

Plaintiff received the speeding citation for driving 30 miles per hour in a 20-mile-per-hour

zone, but plaintiff was not speeding at the time.  Complaint (Doc. #1) filed November 24, 2020 at

4–5.  The record provides no additional information regarding this citation.

Plaintiff received a third citation for not stopping at a stop sign.  The officer entered the

clinic to give plaintiff the citation in front of his colleagues.  This had never occurred before and

plaintiff found it "humiliating."  Exhibit A (Doc. #48-2) at 3.  Plaintiff said that the officer issued

this ticket because plaintiff had not stopped at a stop sign the day before, which made plaintiff

suspect that he was "being followed by the Caucasian police officers."  Exhibit D (Doc. #48-5) at

4–5.

Event 3

On September 24, 2014, Brosa issued written counseling to plaintiff for being discourteous

and unprofessional to Stacy Weeks, a physician in Internal Medicine.  The counseling stated that

plaintiff had sent Weeks an email which stated: "Why aren't you sure. What exactly do you do in

Topeka VA. Are you a janitor or a teacher?"  Brosa Declaration (Doc. #47-3) at 13.[7]  The

counseling warned plaintiff not to send derogatory, condescending or rude emails.

---

[7]        The record provides no additional context for this email exchange.

<u>Event 4</u>

On November 21, 2014, Brosa issued plaintiff another written counseling for leaving a patient unattended in a room while sedated on November 6, 2014 and writing inappropriate comments in patient medical charts.

The written counseling quoted hospital protocol that "the designated member of the operating room team who has performed the identification must stay with the patient until the patient is in the procedure room."  <u>Brosa Declaration</u> (Doc. #47-3) at 40.  Plaintiff admitted that he had left a sedated patient in a room for approximately five to ten minutes, but that the patient was not unattended because his attending nurses were with the patient in a connected room without a door, so plaintiff would hear if the nurses called him back into the room.

The written counseling further stated that plaintiff had entered inappropriate comments on patient medical records on September 18, November 5 and November 7, 2014.  On all three dates, plaintiff left comments in patient medical records asking for a surgeon to perform the patient's diagnostic endoscopy.  Brosa responded to one of the comments by stating that the endoscopy should be performed by the Medicine Service Line instead of the Surgical Service Line.  Peterson responded to another comment by stating that patient medical records were an inappropriate place to discuss general scheduling issues.  The counseling warned plaintiff that it was inappropriate to discuss general scheduling issues in patient medical records.

<u>Event 5</u>

In April of 2015, plaintiff's physician assistant left her job, and his workload became more strenuous.  While not entirely clear from the complaint, plaintiff appears to state that the Topeka VA Medical Clinic's "block schedule" assigned him more work than similarly situated, non-Indian colleagues.  Beebe created the block schedule in 2009 to schedule medical procedures in shared

operating and procedure rooms.  The block schedule assigned plaintiff, the clinic's only gastroenterologist, significantly larger blocks of time for scheduling appointments than other doctors.  One instance of the block schedule assigned plaintiff 8:00 a.m. to 2:30 p.m. on Monday, Tuesday, Wednesday and Friday, and 8:00 a.m. to 12:30 p.m. on Thursday.  By comparison, the block schedule only assigned Beebe 10:00 a.m. to 1:00 p.m. on Tuesday and 8:00 a.m. to 12:00 p.m. on Thursday.  Within the assigned blocks of time, each doctor could schedule his or her procedures.  Plaintiff and his scheduler, Chloe Sevigny, exclusively determined when to schedule them, and plaintiff could send patients to a private community clinic if his schedule was too full.

Event 6

On April 16, 2015, plaintiff reported that "Clinically Indicated Dates (CIDs) were missing, along with deliberate scheduling changes and bowel prep changes from medical records for [his] patients."  ROI Documents (Doc. #47-8) at 3.  Plaintiff alleged that Brosa and Cline "shut down" his attempts to bring the scheduling issues to their attention and told him "this is inappropriate."  Mohapatra Deposition Excerpts (Doc. #47-6) at 19.  His supervisors did not act on his report.

Event 7

On May 5, 2015, defendant assigned plaintiff a heavier workload than other operators in the operating room.  The record provides no further information about Event 7.

Event 8

On May 5, 2015, Cline emailed plaintiff a written counseling which warned him to stop asking the Surgical department to perform endoscopies "unless it is their patient and they are doing it pre-op i.e. to localize a tumor or similar reason," and to refrain from being impolite, sarcastic or

negative in emails to staff members.  Brosa Declaration (Doc. #47-3) at 44.  Cline warned plaintiff that failure to follow these instructions could result in disciplinary letters or actions.

Event 9

On May 8, 2015, Brosa emailed plaintiff a written counseling for continuing to leave inappropriate comments in patient medical charts.  The counseling listed several comments in patient medical charts where plaintiff appeared to complain about scheduling issues.  The counseling warned plaintiff to "cease immediately" and stated, "If you would like to comment in email format, using appropriate language regarding the problem, that is acceptable.  This is not." Brosa Declaration (Doc. #47-3) at 35.

Event 10

On July 1, 2015, for the first time since he began working for the VA, defendant discontinued plaintiff's annual retention bonus, which amounted to about nine per cent of his salary.  Cline claimed that defendant discontinued plaintiff's bonus because his productivity was relatively low and his salary was relatively high compared to other specialists at similar VAs.

Event 11

On September 30, 2015, plaintiff arrived about 90 minutes late to work.  When plaintiff arrived, Brosa spoke with him privately to discuss his tardiness.  Brosa claimed that during this conversation, plaintiff's speech was slurred.  Plaintiff disputes this, and told Brosa he had taken a Benadryl for his sore throat.  Brosa told plaintiff that Human Resources would request a drug test and she left to speak to Human Resources.  By the time Brosa returned five minutes later, plaintiff had left the clinic for the day.  Brosa charged plaintiff as absent without leave ("AWOL").

On October 1, 2015, Brosa met with plaintiff, an HR representative and a union representative, and gave plaintiff an authorized absence form which was essentially a paid

suspension.   Klopfer (the Executive Director/CEO of the Eastern Kansas Health Care System) signed the authorized absence form.   During this meeting, Brosa never told plaintiff why he was being suspended or why she expected him to take a drug test.

Event 12

On November 6, 2015, Cline issued a letter of proposed removal for plaintiff.   Cline cited three grounds for the proposed removal: (1) failure to follow supervisor's instructions, (2) being AWOL and (3) failure to follow proper leave procedures.

Under charge (1), the proposed removal stated as follows:

You have been counseled numerous times, both verbally and in writing, about not referring endoscopies to the Surgical Department.   You have been directed by your supervisor, Dr. Brosa . . . as well as the Medicine Service Chief, Dr. Cline, to cease all referrals to the Surgery Department; however you have repeatedly continued to do so . . . .   This is a blatant failure to follow supervisory instructions.

Cline Declaration (Doc. #47-4) at 15.   The proposed removal listed seven incidents between August 24 and September 15, 2015 where plaintiff stated in a medical chart that he would not perform an endoscopy for the patient.   In six of those incidents, plaintiff stated that a surgeon in the Surgical Service Line should perform the endoscopy.

Also under charge (1), the proposed removal stated that on September 30, 2015, Brosa had directed plaintiff to wait in his office to undergo drug testing, but plaintiff had left the hospital without permission.

Under charge (2), the proposed removal described two incidents where Brosa charged plaintiff as absent without leave.   First, on September 22, 2015, plaintiff did not show up for work or call Brosa to request leave on a day when he had patients scheduled.[8]   Brosa asked police to

_____

[8]       Record shows that on August 31, 2015, Brosa emailed her phone number to plaintiff and other staff under her supervision and stated that staff must contact her when they called in to work or requested leave so that she could approve it.

perform a welfare check to plaintiff's home, but plaintiff still did not call Brosa or show up for work.  Brosa charged plaintiff as AWOL for the day.  On September 30, 2015, Brosa also charged plaintiff as AWOL after he showed up to work late and then left early, shortly after his conversation with her.

Under charge (3), the proposed removal stated that plaintiff had failed to follow proper leave procedures on September 22 and September 30, 2015 when he failed to contact Brosa to request leave.

Cline issued the proposed removal.  He did not write it himself; someone in HR had written it.  Cline testified that he had conversations with Klopfer about the proposed removal, but he did not recall the details.  Exhibit E (Doc. #48-6) at 6.  Klopfer testified that he did not discuss the proposed removal with Cline because Klopfer was the "deciding official."  Exhibit J (Doc. #48-11) at 4–5.  It would have been improper for Klopfer, as the deciding official, to discuss the proposed removal with Cline, the proposing official.  Defendant's Reply To Plaintiff's Opposition To Defendant's Motion For Summary Judgment (Doc. #51) filed July 27, 2022 at 65.

Event 13

On December 18, 2015, Klopfer discharged plaintiff.  The written notice of discharge listed charges (1) through (3) as the reasons for plaintiff's discharge.

EEOC Investigation

On February 29, 2016, Nicolas Escobedo, an Investigator with VA Resolution Management, conducted a telephone interview with Rafael Montecino while investigating plaintiff's EEOC complaint.  Plaintiff had identified Montecino as a witness to defendant's discriminatory and retaliatory actions.  Montecino, a Hispanic male physician, worked in the Surgery Department at the Leavenworth VA Medical Clinic.  He stated that he had a working

relationship with plaintiff and had patients in common with him.  Montecino stated that (1) he was "aware of acts of discrimination and reprisal going on at the Eastern Kansas VA" against plaintiff; (2) "the facility"—presumably, the Topeka VA Medical Center—was an "awful place to work" with a "toxic environment;" (3) plaintiff was asked to do more work and endoscopies while his surgeon colleagues "did very little;" and (4) the agency director, chief of staff and chief of surgery were known to be against foreigners, as foreigners "get the stick" but their Caucasian counterparts do not.  Exhibit N (Doc. #48-15) at 2–3.  Montecino appeared to state that a variety of White supervisors and colleagues at the Leavenworth VA Medical Clinic had discriminated against Montecino personally by assigning him a disproportionate share of surgery work and verbally abusing him.  It is unclear whether these supervisors had any authority over the Topeka VA Medical Center or any interactions with plaintiff.

On February 29, 2016, Escobedo conducted an interview with Mahoua Ray, whom plaintiff also identified as a witness.  Ray, an Indian female physician, worked as the Associate Chief of Anesthesia for the Leavenworth VA Medical Clinic until she resigned in May of 2015.  Ray was Beebe's direct supervisor.  She physically worked out of the Leavenworth clinic but traveled to the Topeka clinic every week to meet with plaintiff and Beebe and discuss their ongoing conflict.  Ray stated that she believed plaintiff was discriminated against due to race, national origin, sex and unspecified "protected activity" because "he was assigned most of the cases in the operating room."  She also stated that she believed "there was discrimination in the facility toward foreigners because about seven foreigners left the agency during her time working there because it was a toxic and stressful working environment."  Exhibit K (Doc. #48-12) at 2–3.

Procedural History

On November 24, 2020, plaintiff filed this action.  Under Title VII, plaintiff alleges that defendant discriminated against him based on three protected characteristics: race, national origin and sex.  Plaintiff does not attribute specific adverse employment actions to specific bases of discrimination, and in seeking summary judgment, defendant does not separately address the sufficiency of plaintiff's claims based on race, national origin and/or sex.

Plaintiff also alleges that defendant retaliated against him for filing a union grievance and an EEO complaint.  Plaintiff does not clearly distinguish between the events which allegedly constituted discrimination, events which allegedly constituted retaliation and events which allegedly constituted both.  Viewing the facts in the light most favorable to plaintiff, the Court assumes that plaintiff intended to allege that Events 1 through 13 were all instances of both discrimination and retaliation.

Plaintiff also alleges that defendant maintained a hostile work environment based on Events 1 through 13.

## **Analysis**

Defendant asserts that it is entitled to summary judgment on plaintiff's discrimination and retaliation claims because (1) the Federal Labor Management Relations Act, 5 U.S.C. § 7121(d), bars plaintiff's Title VII claims; (2) plaintiff cannot establish a prima facie case of discrimination or retaliation for any of his claims; and (3) defendant had legitimate, non-retaliatory reasons for any adverse employment actions against plaintiff.  Further, defendant argues that it is entitled to summary judgment on plaintiff's hostile work environment claim because plaintiff did not establish that defendant targeted him for harassment because of race, national origin or sex.

## I.      Federal Labor Management Relations Act, 5 U.S.C. § 7121

Defendant argues that the Federal Labor Management Relations Act ("FLMRA"), 5 U.S.C. § 7121(d), bars plaintiff from bringing a Title VII claim because plaintiff raised his discrimination claim in a union grievance before he filed his EEOC complaint.  Plaintiff argues that his union grievance does not preclude his EEOC complaint because the two grievances complain of different actions by different persons at different times.

The FLMRA states in relevant part that if a federal employee is affected by a prohibited personnel practice (including discrimination based on race, national origin or sex) that also falls under the coverage of the employee's negotiated grievance procedure in a collective bargaining agreement, the employee may raise the matter under a statutory procedure (such as filing an EEOC complaint under Title VII) or the negotiated procedure, but not both.[9]  "Matter" refers to "the underlying government action which precipitated the complaint."  Giove v. U.S. Dep't of Transp., 178 F. App'x 814, 818 (10th Cir. 2006) (citing Bonner v. Merit Sys. Protection Bd., 781 F.2d 202, 204–05 (Fed. Cir. 1986)).  If an employee chooses to file a union grievance, that choice is irrevocable, and the employee cannot thereafter file an EEOC complaint based on the same matter. Douglas v. Norton, 167 F. App'x 698, 711 (10th Cir. 2006) (EEOC complaint filed after union grievance must be dismissed).  The employee has the right to appeal the final decision of the union grievance process to the EEOC if his claims involve a complaint of discrimination.  29 C.F.R. § 1614.301(a); Hickey v. Brennan, 969 F.3d 1113, 1119 (10th Cir. 2020).

---

[9]      Under 5 U.S.C. § 7121(d), an aggrieved employee affected by a prohibited personnel practice under Section 2302(b)(1) which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both.  Prohibited personnel practices under Section 2302(b)(1) include discrimination on the basis of race, national origin or sex.

Here, plaintiff belonged to the AFGE union and discrimination claims fell within the AFGE's negotiated grievance procedure.  Master Agreement Between DVA/AFGE Excerpts (Doc. #47-9) at 9.  Plaintiff filed a union grievance and by July 1, 2014, had progressed to Step 3 of the AFGE's negotiated grievance procedure.[10]  Plaintiff's union declined to advance the grievance to Step 4, which was arbitration, and neither plaintiff nor the AFGE further pursued the grievance.[11]  Instead, plaintiff contacted an EEO officer on May 14, 2015 and filed a formal EEOC complaint on July 24, 2015.

Defendant argues that Section 7121 precluded plaintiff from filing an EEOC complaint because he had raised his discrimination claim in the union grievance.  Plaintiff argues that his union grievance and his EEOC complaint do not raise the same "matter," as required for the union grievance to preclude the EEOC complaint, because the union grievance and the EEOC complaint allege different actions by different persons at different times.

Plaintiff filed his union grievance, which focused almost entirely on his dispute with Beebe, on July 1, 2014.  The grievance complained that Beebe demoralized, harassed and disrespected

---

[10]     As noted, the record is unclear how plaintiff got to Step 3.  While defendant notes that plaintiff "has not demonstrated that he satisfied Step 1 and Step 2," it makes no argument that the union grievance was improper.  Defendant's Memorandum In Support Of Motion For Summary Judgment (Doc. #47) filed June 17, 2022 at 30.  Ultimately, the issue is immaterial to the decision here.

[11]     Defendant argues that because the AFGE declined to submit the union grievance to arbitration, plaintiff did not exhaust administrative remedies for the union grievance and the Court therefore lacks jurisdiction over plaintiff's Title VII claims.  Defendant's Memorandum In Support Of Motion For Summary Judgment (Doc. #47) filed June 17, 2022 at 30.  Prior to 2018, the Tenth Circuit held that "a plaintiff's exhaustion of his or her administrative remedies is a jurisdictional prerequisite to suit under Title VII—not merely a condition precedent to suit."  Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005).  The Tenth Circuit now holds that "a plaintiff's failure to exhaust administrative remedies before bringing a Title VII . . . claim does not deprive a federal court of jurisdiction over the claim" but merely permits the employer to raise an affirmative defense of failure to exhaust.  Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1181–82, 1185 n.10 (10th Cir. 2018).  The Court therefore has jurisdiction in this case.

him and that she did not perform her fair share of the work.  Plaintiff filed his EEOC complaint on July 24, 2015, based on Events 1 through 13, which took place between July 23, 2014 and December 18, 2015.  None of these events had transpired at the time when plaintiff filed the union grievance.  Further, plaintiff's supervisors—Brosa, Cline and Klopfer, rather than Beebe—committed most of the complained-of actions in Events 1 through 13, with the remainder committed either by the VA police (Event 2) or by an alleged joint effort of white VA physicians (Events 5, 7 and 10).  The EEOC complaint therefore challenged different conduct by different actors than the union grievance.  Section 7121(d) does not bar plaintiff's Title VII complaint.

## II.      Race, National Origin and Sex Discrimination

Plaintiff claims that defendant discriminated against him on the basis of race, national origin and sex in (1) failing to prevent Beebe from discriminating against him and siding with Beebe in the dispute over who should perform endoscopies; and (2) engaging in the conduct described as Events 1 through 13.  As noted, neither party has attempted to analyze plaintiff's claims as ones based on discretely improper motives or to distinguish theories of discrimination based on race, national origin and/or sex.  The Court likewise lumps together all three theories of recovery.  This approach is far from ideal, but the parties' briefs leave no alternative.

Plaintiff may establish that defendant acted with discriminatory intent under Title VII either directly, through direct or circumstantial evidence or indirectly, through the inferential burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).  Here, plaintiff relies on the indirect method of proving discrimination based on race, national origin and/or sex—which the Court addresses as a single form of discrimination.

Plaintiff bears the initial burden to make a prima facie case.  Id. at 802.  To establish a prima facie case, plaintiff must show, by a preponderance of the evidence, that (1) he is a member

of a protected class, (2) he suffered an adverse employment action and (3) the challenged action occurred under circumstances giving rise to an inference of discrimination.  Bennett v. Windstream Commc'ns, Inc., 792 F.3d 1261, 1266 (10th Cir. 2015).  One method by which a plaintiff may show circumstances giving rise to an inference of discrimination is to show that the employer treated similarly situated employees more favorably.  EEOC v. PVNF, LLC, 487 F.3d 790, 800–01 (10th Cir. 2007).  Employees are similarly situated when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline and have engaged in conduct of "comparable seriousness."  McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006).

If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for the adverse employment action.  Reynolds v. Sch. Dist. No. 1, Denver, Colo., 69 F.3d 1523, 1533 (10th Cir. 1995).  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."  Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).  Plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Townsend v. Lumbermens Mut. Cas. Co., 294 F.3d 1232, 1242 (10th Cir. 2002) (quoting Morgan v. Hilti, 108 F.3d 1319, 1323 (10th Cir. 1997)).  However, "[m]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."  Bekkem v. Wilkie, 915 F.3d 1258, 1268 (10th Cir. 2019).

A.      **Dispute About Plaintiff's Workload**

Plaintiff is a member of three protected classes: he is Indian (race), he is from India (nationality) and he is male (sex).  Therefore, to establish a prima facie case of discrimination, plaintiff must show that defendant committed adverse employment action under circumstances which give rise to an inference of discrimination on one or more of these grounds, individually or collectively.

While plaintiff explicitly states that Events 1 through 13 give rise to his charge of discrimination and retaliation, plaintiff also generally argues that defendant discriminated against him by offering preferential treatment to Beebe, a similarly situated white female employee. Specifically, plaintiff argues that defendant assigned him long hours performing endoscopies and other gastroenterology work while Beebe sat idle and plaintiff's supervisors blocked his attempts to make the workload distribution more equitable.

Plaintiff has presented evidence that (1) he had a significantly more strenuous workload than Beebe; (2) he repeatedly asked for Beebe and the other surgeons to share his endoscopy workload; and (3) his supervisors refused, even though surgeons are competent to perform endoscopies.  This evidence creates a genuine issue of material fact whether plaintiff's disparate workload constituted adverse employment action.  See Jones v. Barnhart, 349 F.3d 1260, 1269–70 (10th Cir. 2003) (increased workload can constituted adverse employment action).

Defendant argues that plaintiff cannot show that his disparate workload occurred under circumstances which give rise to an inference of discrimination.  It argues that plaintiff and Beebe were not similarly situated because they worked in different departments under different immediate and secondary supervisors.  Plaintiff correctly responds that he and Beebe were similarly situated because they were both qualified to perform endoscopies and although they had

different immediate and secondary supervisors in separate departments, they ultimately both reported to the same Acting Chief of Staff and Executive Director/CEO for the overall clinic. Defendant has not provided evidence that plaintiff and Beebe were subject to different standards governing workloads, performance evaluation or discipline. Construing factual disputes in the light most favorable to plaintiff, plaintiff has established a genuine issue of material fact whether he and Beebe were similarly situated and defendant treated Beebe more favorably than plaintiff. Plaintiff has therefore established a genuine issue of material fact on his prima facie case.

Because plaintiff has established a prima facie case, the burden shifts to defendant to articulate legitimate, nondiscriminatory reasons for plaintiff's disparate workload. Defendant argues that it assigned endoscopies to plaintiff and not Beebe because Brosa determined that a gastroenterologist was better situated to perform routine endoscopies than a surgeon, and plaintiff chose not to exercise options that would lighten his workload, such as sending patients to private clinics in the community. Defendant has articulated legitimate, nondiscriminatory reasons for plaintiff's disparate workload. See DePaula v. Easter Seals El Mirador, 859 F.3d 957, 970 (10th Cir. 2017) (defendant's burden to show nondiscriminatory reasons is "exceedingly light").

The burden therefore shifts to plaintiff to show that defendant's stated reasons are pretextual. Plaintiff argues that fee basis surgery costs U.S. taxpayers more money, that it was more reasonable for Beebe and the other surgeons to perform endoscopies, and that his supervisor's agreement with Beebe is therefore "incoherent." Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. #48) filed July 8, 2022 at 51–52. This argument does not establish a genuine issue of material fact as to pretext because courts may not "second guess the business judgment of the employer," and evidence that the employer was mistaken or used poor business judgment is insufficient to show pretext. DePaula, 859 F.3d at 970 (citation omitted).

Plaintiff has presented evidence, however, that his supervisors discouraged him from sending patients to private clinics in the community. Such evidence contradicts defendant's stated reasons for the disparate workloads and raises a genuine issue of material fact whether defendant's stated reasons for the workload distribution were pretextual. The Court therefore overrules defendant's motion for summary judgment on plaintiff's claim that defendant discriminated against him on the basis of race, national origin and sex in assigning him a disparately heavy workload.

### B.      Events 1 and 6 (Alteration of Hospital Records)

Plaintiff claims that defendant's actions in Events 1 and 6 discriminated against him on the basis of race, national origin and sex. In Events 1 and 6, it appears from the record that an unknown actor or actors tampered with information in the medical records for plaintiff's patients and that plaintiff's supervisors did not act on his reports of the tampering. Event 1 occurred on July 23, 2014. The record provides no further details about Event 1. In Event 6, which occurred on April 16, 2015, "Clinically Indicated Dates (CIDs) were missing, along with deliberate scheduling changes and bowel prep changes from medical records for [plaintiff's] patients." Mohapatra's Second Amended Responses And Objections To Defendant's First Interrogatories To Plaintiff (Doc. #47-7) at 3. The record provides no further details about Event 6.

Defendant argues that as a matter of law, supervisory inaction with respect to Events 1 and 6 did not constitute adverse employment action because they did not cause a significant change in plaintiff's employment status. Plaintiff argues the inaction constituted adverse employment action because "[c]hanges or additions to medical records attributed to plaintiff, but that he did not make, would result in errors in patient care, which in turn would cause humiliation, damage to reputation, and harm to future employment prospects." Plaintiff's Opposition to Defendant's Motion For Summary Judgment (Doc. #48) at 48.

Generally, an adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Jones v. Okla. City Pub. Schs., 617 F.3d 1273, 1279 (10th Cir. 2010) (quoting Hillig v. Rumsfeld, 381 F.3d 1028, 1032–33 (10th Cir. 2004)). An adverse employment action is not limited to "monetary losses in the form of wages or benefits." Id. (quoting Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998)). A "mere inconvenience or an alteration of job responsibilities," however, does not qualify. Id.

At the prima facie stage, plaintiff bears the burden of establishing his case by a preponderance of the evidence. Id. Plaintiff has not provided sufficient evidence to raise a genuine issue of material fact whether Events 1 and 6 constitute adverse employment action. The record does not detail how the medical records changed, why those changes were significant or how the alleged tampering caused errors in patient care, humiliation, damage to plaintiff's reputation or harm to his future employment prospects. Plaintiff has not demonstrated a genuine issue of material fact whether Events 1 or 6 constituted adverse employment actions, and defendant is entitled to summary judgment on these claims of discrimination.

### C.    Event 2 (Traffic Citations)

Plaintiff claims that defendant's actions in Event 2 discriminated against him on the basis of race, national origin and sex. In Event 2, the VA police issued plaintiff three separate traffic citations within a relatively short period of time. The exact dates of these citations are uncertain. Plaintiff states that he received all three within a ten-day period in September or October of 2014. Edwards, the Chief of the VA police, states that at least one of the citations occurred on November 10, 2014.

Defendant argues that as a matter of law, such evidence does not state a prima facie case of discrimination because (1) the VA police issued the citations rather than any of plaintiff's supervisors and (2) the citations were not adverse employment actions.  Plaintiff argues that he has plausibly demonstrated that his supervisors worked with the VA police to issue the tickets because the timing was "suspicious," i.e. the three incidents occurred close in time and only a few months after he filed his union grievance complaining about Beebe, a White female, on July 1, 2014.  He further argues that (1) the citation for whiskey in the car was suspicious because an officer would have had to use a flashlight to see the bottle through his tinted window, (2) the citation for speeding was suspicious because plaintiff was not speeding and (3) the citation for not stopping at a stop sign was suspicious because the officer did not give him the citation until the next day and the officer (for the first time) entered the clinic to issue the citation in front of plaintiff's colleagues.  Plaintiff argues that the citations constituted adverse employment actions because they "caused humiliation."

For purposes of Title VII discrimination claims, adverse employment action is an action that results in a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Okla. City Pub. Schs., 617 F.3d at 1279 (quoting Hillig, 381 at 1032–33).  Plaintiff has cited no evidence that any traffic citation caused a "significant change in employment status," as required to establish a prima facie case of Title VII discrimination.  Plaintiff has provided no facts indicating that a traffic citation (or three traffic citations) from the VA Police could have any bearing on his employment status.  He therefore has not met his burden of demonstrating a genuine issue of material fact whether he suffered an adverse employment action when he received three traffic citations, even if they were issued under suspicious circumstances

and even if they humiliated him.  See Braxton v. Nortek Air Solutions, LLC, 769 F. App'x 600, 605 (10th Cir. 2019) (without risk of harm to plaintiff's future employment prospects, feelings of humiliation alone insufficient to establish adverse employment action); Sanchez, 164 F.3d at 532 (without significant change in employment status, plaintiff's personal discomfort with lateral transfer insufficient to establish adverse employment action).  Defendant is entitled to summary judgment for plaintiff's discrimination claim as to Event 2.

### D.    Events 3 and 4 (Written Counselings)

Plaintiff claims that defendant's actions in Events 3 and 4 discriminated against him on the basis of race, national origin and sex.  In Events 3 and 4, Brosa issued plaintiff written counselings on September 24 and November 21, 2014.  Defendant argues that as a matter of law, plaintiff failed to timely exhaust administrative remedies for Events 3 and 4 because he did not contact an EEO counselor until May 15, 2015, more than 45 days after the events occurred.

Before filing suit under Title VII, plaintiff must exhaust administrative remedies.  See Hickey v. Brennan, 969 F.3d 1113, 1124 (10th Cir. 2020).  Under EEOC regulations, a federal employee who believes that he has been discriminated against on the basis of a protected characteristic must consult an EEO counselor before filing an EEOC complaint, and must initiate contact with a counselor "within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1).  This exhaustion requirement is not a jurisdictional prerequisite to suit but is a claims-processing rule that the employer may raise as an affirmative defense.  See Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1185 (10th Cir. 2018).

Plaintiff does not dispute that he initiated contact with the EEO counselor more than 45 days after Events 3 and 4 and raises no argument that his failure should be excused or extended. Therefore, as a matter of law, plaintiff did not exhaust administrative remedies for Events 3 and 4

and cannot bring a Title VII discrimination or retaliation claim based on those events.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 101–03 (2002) (each discrete incident of discrimination or retaliation constitutes separate "unlawful employment practice" for which administrative remedies must be exhausted).  Defendant is entitled to summary judgment on the discrete acts of discrimination alleged in Events 3 and 4.[12]

###### E.     Events 5, 7 and 10 (Block Schedule, Workload and Retention Bonus)

Plaintiff claims that defendant's actions in Events 5, 7 and 10 discriminated against him on the basis of race, national origin and sex.  Plaintiff concedes that Events 5, 7 and 10 are not adverse employment actions for purposes of his discrimination claim.  Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. #48) at 49.  An adverse employment action is a necessary element for plaintiff to show a prima facie case of discrimination.  Ford v. Jackson Nat'l Life Ins. Co., 45 F.4th 1202, 1222 (10th Cir. 2022).  Based on plaintiff's concession, defendant is entitled to summary judgment as to Events 5, 7 and 10.

###### F.     Events 8 and 9 (Written Counselings)

Plaintiff claims that defendant's actions in Events 8 and 9 discriminated against him on the basis of race, national origin and sex.  In Events 8 and 9, defendant issued plaintiff written counselings on May 5 and May 8, 2015.  By email on May 5, Cline told plaintiff to stop asking the surgical department to perform endoscopies.  By email on May 8, Brosa told plaintiff to stop complaining about scheduling issues in patient medical charts.

---

[12]     Plaintiff correctly notes that the Court may consider Events 3 and 4 as background evidence in support of the timely-filed parts of his discrimination and retaliation claims.  Morgan, 536 U.S. at 113.  Further, Events 3 and 4 may be actionable as part of plaintiff's hostile work environment claim.  Id. at 103 (court may consider entire time period of hostile work environment if one act contributing to claim occurs within filing period).

Defendant argues that as a matter of law, Events 8 and 9 were not adverse employment actions because they were merely reprimands and did not adversely affect the likelihood that plaintiff would be terminated, undermine his employment status or affect his future employment opportunities.  Plaintiff argues the counselings constituted adverse employment action because Cline's counseling stated that plaintiff could be terminated if he did not comply, and Klopfer testified that when he decided to terminate plaintiff's employment, he took into account plaintiff's history of refusing to follow his supervisor's instructions to stop asking surgeons to perform endoscopies.  Plaintiff's proposed removal and written notice of discharge also listed plaintiff's repeated attempts to refer endoscopies to surgeons as a ground for termination.

Because Cline's counseling about referring endoscopies to surgeons (Event 8) eventually became part of defendant's stated reasons for terminating plaintiff's employment, plaintiff has established a genuine issue of material fact whether it resulted in a significant change in employment status and therefore constituted an adverse employment action.  Plaintiff has not established, however, that the counseling in Event 9 constituted adverse employment action. Plaintiff cites no evidence or argument that the warning about leaving comments in patient medical records eventually contributed to defendant's decision to terminate his employment or caused any other significant change in his employment status.  Plaintiff has not established a genuine issue of material fact as to Event 9.

To establish a prima facie case for Event 8, plaintiff must show that defendant told him to stop asking the surgery department for help under circumstances which give rise to an inference of discrimination.  As explained above, the circumstances surrounding plaintiff's disparate workload raise a genuine issue of material fact on the issue of discrimination.  The written counseling of May 5, 2015 was part and parcel of that issue and occurred in circumstances which

give rise to an inference of discrimination on the basis of race, national origin and sex. For purposes of summary judgment, plaintiff has established a prima facie case of discrimination on the basis of race, national origin and sex as to Event 8.

At this point, under the <u>McDonnell Douglas</u> burden-shifting scheme, the burden would typically shift to defendant to articulate a legitimate, nondiscriminatory reason for taking adverse employment action. In <u>Defendant's Reply to Plaintiff's Opposition to Defendant's Motion For Summary Judgment</u> (Doc. #51) at 77–78, defendant argues for the first time that it had legitimate nondiscriminatory reasons for telling plaintiff to stop asking the Surgical department to perform endoscopies. Arguments raised for the first time in a reply brief, on a motion for summary judgment, are waived and will not be considered. <u>Water Pik, Inc. v. Med–Syst., Inc</u>., 726 F.3d 1136, 1159 n.8 (10th Cir. 2013). The Court therefore overrules defendant's motion for summary judgment on plaintiff's discrimination claim based on the written counseling on May 5, 2015 (Event 8).

### G.      Event 11 (AWOL and Suspension)

Plaintiff claims that defendant's actions in Event 11 discriminated against him on the basis of race, national origin and sex. In Event 11, plaintiff arrived to work 90 minutes late on September 30, 2015 and Brosa instructed him to take a drug test. Rather than take the drug test, plaintiff left work and went home. Brosa, who had recently emailed plaintiff and other subordinates telling them to contact her and get approval before taking leave from work, charged him as AWOL. Defendant suspended plaintiff the next day. Klopfer signed plaintiff's suspension form.

Defendant argues that as a matter of law, plaintiff fails to state a prima facie case of discrimination for Event 11. Defendant raised this argument for the first time in its reply brief and

therefore waives this argument.  See Water Pik, 726 F.3d at 1159 n.8.  The burden to establish a prima facie case, however, still rests with plaintiff.

Plaintiff correctly argues that his AWOL charge constituted adverse employment action. Plaintiff's proposed removal and written notice of discharge listed plaintiff's AWOL charge on October 1, 2015 as a ground for termination.  Plaintiff therefore establishes a genuine issue of material fact whether his AWOL charge and suspension in Event 11 resulted in a significant change in employment status and therefore constituted adverse employment action.

Plaintiff, however, does not meet his burden of raising a genuine issue of material fact whether his suspension occurred in circumstances which give rise to an inference of discrimination.  He provides no evidence or argument raising such an inference.  In Plaintiff's Opposition to Defendant's Motion For Summary Judgment (Doc. #48) at 52–54, plaintiff only presents arguments that the circumstances of his suspension give rise to an inference of retaliation because he filed the EEOC complaint two months before defendant suspended him.  This temporal proximity does not give rise to an inference of discrimination based on race, national origin and/or sex.

Even viewing all facts in the record in the light most favorable to plaintiff, defendant suspended plaintiff after he arrived 90 minutes late to work without permission and left work early without permission on September 30, 2015, violating defendant's policies that required him to get Brosa's permission before missing work.  These circumstances alone do not raise a genuine issue of material fact whether defendant suspended plaintiff in circumstances that give rise to an inference of discrimination on the basis of race, national origin and/or sex, and plaintiff has not established such a genuine issue of material fact because he fails to make any such argument in

his brief.  Defendant is entitled to summary judgment on the discrete acts of discrimination alleged in Event 11.

### H.        Events 12 and 13 (Proposed Removal and Termination of Employment)

Plaintiff claims that defendant's actions in Events 12 and 13 discriminated against him on the basis of race, national origin and sex.  In Events 12 and 13, Cline issued a proposed removal and Klopfer ultimately issued a notice of termination for plaintiff, based on three grounds: (1) failure to follow supervisor's instructions to stop referring endoscopies to surgeons, (2) being AWOL on September 22 and September 30, 2015 and (3) failure to follow proper leave procedures on September 22 and September 30, 2015.

Defendant argues that as a matter of law, plaintiff fails to state a prima facie case of discrimination for Events 12 and 13.  Defendant raised this argument for the first time in its reply brief and therefore waives this argument.  See Water Pik, 726 F.3d at 1159 n.8.  The burden to establish a prima facie case, however, still rests with plaintiff.  It is undisputed that his termination constituted adverse employment action.  Further, defendant terminated plaintiff's employment in part because plaintiff repeatedly attempted to lighten his endoscopy workload by referring endoscopies to surgeons.  This is part and parcel of plaintiff's claim that defendant discriminated against him by assigning him a heavier workload than Beebe, his similarly situated White female colleague.  Viewed in the light most favorable to plaintiff, this factor raises a genuine issue of material fact whether defendant terminated plaintiff's employment in circumstances that give rise to an inference of discrimination based on race, national origin, and/or sex.  For purposes of summary judgment, plaintiff has therefore established a prima facie case.

Defendant argues that grounds (1), (2) and (3) constituted legitimate, nondiscriminatory reasons for terminating plaintiff's employment.  Plaintiff responds that these reasons were pretexts

for discrimination because Klopfer improperly conferred with Cline, who proposed the removal. Cline testified that he discussed the removal with Klopfer, while Klopfer denied this.  The parties agree, however, that it would have been improper for Klopfer to confer with Cline about the removal.

While evidence that defendant acted contrary to a company policy or practice when making adverse employment decisions can establish pretext, the ultimate question is whether plaintiff has discredited defendant's stated reasons for adverse employment action by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find them unworthy of credence."  Townsend, 294 F.3d at 1242 (citations omitted).  Construing the record in the light most favorable to plaintiff, Cline and Klopfer improperly discussed plaintiff's removal.  Even so, this does not automatically discredit defendant's stated reasons for terminating plaintiff's employment.  Plaintiff does not dispute grounds (2) and (3): he was AWOL on September 22 and September 30, 2015 and he failed to follow proper leave procedures on those days.  As explained above, however, ground (1) is part and parcel of plaintiff's claim that defendant discriminated against him by assigning him a heavier workload than Beebe, his similarly situated White female colleague.  Taking all these circumstances into account, plaintiff has raised a genuine issue of material fact whether defendant's stated reasons for terminating plaintiff's employment were pretextual.  The Court therefore overrules defendant's motion for summary judgment on plaintiff's race, national origin and sex discrimination claim on these grounds.

## III.    Retaliation

Title VII prohibits retaliation against an employee because he has "opposed" an unlawful practice under Title VII or because he made a charge, assisted or participated in an investigation,

proceeding or hearing under Title VII.  42 U.S.C. § 2000e-3(a); <u>Salemi v. Colo. Pub. Emps. Ret.</u> <u>Ass'n</u>, 747 F. App'x 675, 695 (10th Cir. 2018).  Title VII retaliation claims based on circumstantial evidence follow the same burden-shifting framework as Title VII discrimination claims.  <u>Bekkem</u>, 915 F.3d at 1267.  To establish a prima facie case of retaliation, plaintiff must show that "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  <u>Argo v. Blue Cross & Blue Shield of</u> <u>Kan., Inc.</u>, 452 F.3d 1193, 1202 (10th Cir. 2006) (citations omitted).  Plaintiff's burden to establish a prima facie case is not onerous.  <u>Texas Dep't of Comm. Affs. v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>see also</u> <u>Bird v. West Valley City</u>, 832 F.3d 1188, 1201 (10th Cir. 2016) (burden is light).

Plaintiff argues that Events 1 through 13 constituted retaliation for filing a union grievance against Beebe on July 1, 2014 and an EEOC complaint against defendant on July 24, 2015. Events1 through 10 occurred after plaintiff filed the union grievance, and Events 11 through 13 occurred after plaintiff filed the EEOC complaint.  Defendant argues that as a matter of law, (1) plaintiff's union grievance did not constitute protected activity, (2) plaintiff cannot establish a prima facie case of retaliation and (3) plaintiff cannot show that defendant's legitimate, nonretaliatory reasons for its actions were pretext.

## A.    Retaliation Based On Plaintiff's Filing Of A Union Grievance

Defendant argues that plaintiff's union grievance did not constitute protected activity under Title VII because the grievance did not mention discrimination on the basis of any protected ground.  A plaintiff's protected activity must oppose a practice made unlawful by Title VII.  <u>Dick</u> <u>v. Phone Directories Co.</u>, 397 F.3d 1256, 1267 (10th Cir. 2005).  Plaintiff may not merely put forward personal complaints or grievances.  <u>Wirtz v. Kan. Farm Bureau Servs., Inc.</u>, 274 F. Supp.

2d 1198, 1212 (D. Kan. 2003).  Vague references to harassment and discrimination are not protected activity where the plaintiff did not indicate that the complained-of activity was motivated by race or some other protected category.  Anderson v. Acad. Sch. Dist. 20, 122 F. App'x 912, 916 (10th Cir. 2004).

Here, plaintiff's union grievance stated in part that the clinic's block schedule was "biased," established unilaterally and made "some" physicians work every day while "others" worked only a few hours a week or not at all.  July 1, 2014 Union Grievance (Doc. #47-10) at 3. The grievance complained that defendant engaged in "discrimination" and violated Article 17, Section 1(A) of the Master Agreement with the AFGE union.  Id.  Section 1(A) provides in part that that all employees shall be treated without discrimination in regard to their race, national origin or sex.  Master Agreement Between DVA/AFGE Excerpts (Doc. #47-9) at 2.

While the grievance did not specifically allege that the complained-of discrimination occurred on the basis of race or some other category protected under Title VII, we construe the facts in the light most favorable to plaintiff.  Viewed in this light, the union grievance opposed a practice made unlawful by Title VII.  The block schedule assigned plaintiff, an Indian male, significantly more surgery time than Beebe, a White female.  Plaintiff complained that this constituted discrimination and directed defendant's attention to a section of the Master Agreement that protected employees from the types of discrimination that Title VII forbids.  Plaintiff therefore identified a genuine issue of material fact whether his union grievance opposed unlawful discrimination on the basis of race, national origin and/or sex, and whether he thus engaged in protected activity when he filed it on July 1, 2014.

Defendant further argues that Events 1 through 10 were not materially adverse actions. Plaintiff concedes that Events 5, 7 and 10 are not legally cognizable adverse actions for purposes

of his retaliation claim, but argues that Events 1–4, 6, 8 and 9 were materially adverse.  Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. #48) at 49.  The Court has determined that plaintiff did not exhaust his administrative remedies for Events 3 and 4 and cannot bring a Title VII discrimination or retaliation claim based on those events.  Events 1, 2, 6, 8 and 9 therefore remain.

A materially adverse action for retaliation purposes is broader than an adverse action for discrimination purposes.  Jones v. McHugh, No. 12-CV-2681-DDC-TJJ, 2014 WL 3107996, *4 (D. Kan. 2014) (citing Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 638 (10th Cir. 2012)). For an action to be materially adverse for purposes of a retaliation claim, it must be sufficient to "dissuade a reasonable worker from making or supporting a charge of discrimination."  Daniels, 701 F.3d at 638 (citation omitted).  This requires injury rising to a level of seriousness.  Id.

### 1.      Events 1 and 6 (Alteration of Hospital Records)

Plaintiff claims that defendant retaliated against him in Events 1 and 6 for filing a union grievance.  On July 23, 2014, it appears from the record that an unknown actor or actors tampered with information in the medical records for plaintiff's patients and plaintiff's supervisors did not act on his reports of the tampering.  On April 16, 2015, "Clinically Indicated Dates (CIDs) were missing, along with deliberate scheduling changes and bowel prep changes from medical records for [plaintiff's] patients."  Mohapatra's Second Amended Responses And Objections To Defendant's First Interrogatories To Plaintiff (Doc. #47-7) at 3.  Defendant argues that as a matter of law, the supervisors' inaction in response to Events 1 and 6 did not constitute adverse actions and that plaintiff cannot demonstrate a causal connection between the supervisors' inaction and the filing of his union grievance.

Even though Events 1 and 6 did not rise to the level of adverse employment action for purposes of a Title VII discrimination claim, plaintiff has met the lighter burden to raise a genuine issue of material fact whether these events were materially adverse for purposes of a retaliation claim. Although Events 1 and 6 did not cause a significant change in plaintiff's employment status, they could dissuade a reasonable worker from making or supporting a charge of discrimination if—as plaintiff alleges—changes or additions to medical records wrongfully attributed to the worker could result in errors in patient care and subsequent humiliation, damage to reputation and harm to future employment prospects. Plaintiff's Opposition to Defendant's Motion For Summary Judgment (Doc. #48) at 48. Plaintiff has therefore established a genuine issue of material fact whether defendant took materially adverse action against plaintiff when his supervisors did not investigate or rectify Events 1 and 6.

Defendant argues that plaintiff cannot show a causal connection between Events 1 and 6 and the filing of his union grievance. Plaintiff may demonstrate a causal connection "by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." O'Neal v. Ferguson Construction Co., 237 F.3d 1248, 1253 (10th Cir. 2001). However, "unless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity." Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004) (citation omitted). A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient. Id.; see Hanson v. Colo. Judicial Dep't, 564 F. App'x 916, 920 (10th Cir. 2014) (four month period between complaint and termination too protracted to infer causation).

Event 1 occurred three weeks after plaintiff submitted his union grievance. For purposes of establishing a prima facie case through temporal proximity, plaintiff has presented sufficient evidence of a causal connection between his union grievance and Event 1. Event 6 occurred nine months after plaintiff submitted his union grievance, so plaintiff cannot therefore establish a prima facie case of causation through temporal proximity alone. See Hanson, 564 F. App'x at 920. Aside from temporal proximity, plaintiff has not advanced any argument that Event 6 is causally connected to his union grievance. Plaintiff therefore has not established a genuine issue of material fact whether defendant retaliated against plaintiff in Event 6.

Because plaintiff established a prima facie case of retaliation based on Event 1, the burden falls on defendant to provide a legitimate, nonretaliatory reason for its actions. Defendant has not articulated a legitimate, nonretaliatory reason for failing to investigate plaintiff's report that someone had tampered with his patient records in Event 1. The Court therefore overrules defendant's motion for summary judgment on plaintiff's retaliation claim based on Event 1.

### 2. Event 2 (Traffic Citations)

Plaintiff claims defendant retaliated against him in Event 2 for filing a union grievance. In Event 2, the VA police issued plaintiff three separate traffic citations within a relatively short period of time. The exact dates of these citations are uncertain, with plaintiff stating that he received all three within a ten-day period in September or October of 2014, and Edwards, the Chief of the VA police, stating that at least one of the citations occurred on November 10, 2014.

Even though Event 2 did not rise to the level of an adverse employment action for purposes of a Title VII discrimination claim, plaintiff has met the lighter burden of raising a genuine issue of material fact whether Event 2 was a materially adverse action for purposes of his retaliation claim. Although Event 2 did not cause a significant change in plaintiff's employment status,

receiving multiple traffic citations from an employer's police force could dissuade a reasonable worker from making or supporting a charge of discrimination.

While the exact dates of these citations are uncertain, the record shows that they occurred in September, October and/or November of 2014.  They therefore occurred between two and five months after plaintiff submitted his union grievance on July 1, 2014.  Construing the facts in the light most favorable to the plaintiff, plaintiff has demonstrated a genuine issue of material fact on the issue of causation based on temporal proximity.  Further, the "suspicious circumstances" of these citations—plaintiff receiving multiple citations in a short period of time, an officer searching through tinted windows with a flashlight, and an officer entering the clinic to publicly give plaintiff a ticket—provide additional evidence of a causal connection.  Plaintiff has therefore established a genuine issue of material fact on the issue of causation for Event 2.

Defendant has not articulated a legitimate, nonretaliatory reason for plaintiff receiving these traffic citations.  The Court therefore overrules defendant's motion for summary judgment on plaintiff's retaliation claim based on Event 2.

### 3. Events 8 and 9 (Written Counselings)

Plaintiff claims defendant retaliated against him in Events 8 and 9 for filing a union grievance.  In Events 8 and 9, defendant issued plaintiff written counselings on May 5 and May 8, 2015.  By email on May 5, Cline told plaintiff to stop asking the Surgical department to perform endoscopies.  By email on May 8, Brosa told plaintiff to stop complaining about scheduling issues in patient medical charts.

In part because Cline's email (Event 8) stated that plaintiff could be further disciplined if he did not comply, the Court found that it constituted adverse employment action for purposes of plaintiff's discrimination claims.  Because the threat of disciplinary action could dissuade a

reasonable worker from making or supporting a charge of discrimination, it is also adverse action for purposes of plaintiff's retaliation claim.  Viewing the facts in the light most favorable to the plaintiff, he has also met the lighter burden of establishing that Brosa's email (Event 9) was a materially adverse action.  Though it did not specifically state that plaintiff's employment might be terminated if he did not comply, plaintiff received this counseling only three days after Cline's email.  The cumulative effect of both counselings could dissuade a reasonable worker from making or supporting a charge of discrimination.

Plaintiff does not cite any evidence or argument that these counselings were causally connected to his union grievance.  As established above, plaintiff argues that the circumstances of the counselings give rise to an inference of discrimination on the basis of race, national origin and sex, but he does not advance any argument that Events 8 and 9 constituted retaliation for his union grievance.  Further, Events 8 and 9 occurred more than eight months after plaintiff submitted his union grievance.  Therefore, plaintiff cannot rely on temporal proximity alone to establish causation.  Because plaintiff has not cited other evidence of causation, he has not established a prima facie case of retaliation based on the filing of his union grievance and Events 8 and 9.

**B.      Retaliation Based On Plaintiff's Filing of an EEOC Complaint**

Plaintiff engaged in protected activity when he filed his EEOC complaint on July 24, 2015.  See Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1217–19 (10th Cir. 2003) (in retaliation claim, EEOC complaint is protected activity).  Furthermore, plaintiff's suspension and termination in Events 11 through 13 constituted materially adverse actions because suspension and termination are sufficiently serious to dissuade a reasonable worker from making or supporting a charge of discrimination.  See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68–70 (2006).  To

establish a prima facie case, however, plaintiff must also show a causal connection between the filing of his EEOC complaint and Events 11 through 13.

### 1.  Event 11 (AWOL and Suspension)

In Event 11, plaintiff arrived to work 90 minutes late on September 30, 2015 and Brosa instructed him to take a drug test.  Rather than take the drug test, plaintiff left work and went home. Brosa, who had recently emailed plaintiff and other subordinates telling them to contact her and get approval before taking leave from work, charged him as AWOL.  Defendant suspended plaintiff the next day.  Klopfer signed plaintiff's suspension form.

Defendant argues that plaintiff cannot show causation between the filing of his EEOC complaint and Event 11 because plaintiff provides no evidence that Klopfer, who apparently authorized plaintiff's suspension, knew about plaintiff's EEOC complaint.  Plaintiff responds that Klopfer's office received notice of employee EEOC complaints and Klopfer testified that he checks in with his designated EEO Manager about the status of those complaints.  Further, plaintiff argues that he established causation because Event 11 occurred just over two months after he filed his EEOC complaint.  Viewing the facts in the light most favorable to plaintiff, plaintiff has raised a genuine issue of material fact whether the filing of his EEOC complaint and Event 11 were causally connected based on temporal proximity.  For purposes of summary judgment, plaintiff has established his prima facie case.[13]

---

[13]    The Court finds that plaintiff established his prima facie case regarding Event 11 for his retaliation claim but not his discrimination claim.  The Court reaches different results because for Event 11, plaintiff does not demonstrate that Event 11 occurred in circumstances that give rise to an inference of discrimination.  For his retaliation claim, plaintiff argues that defendant suspended him only two months after he filed his EEOC claim, which raises a genuine issue of material fact based on temporal proximity.  Plaintiff's argument that Klopfer (who authorized plaintiff's suspension) received notice of his EEOC complaint also weighs in favor of his

(continued . . .)

Defendant argues that it had legitimate, nondiscriminatory reasons for suspending plaintiff and that plaintiff cannot show those reasons were pretextual.  Defendant claims that it suspended plaintiff because (1) plaintiff's speech was slurred and (2) he arrived late to work and then left work early without Brosa's permission.

Plaintiff argues that defendant's stated reasons are pretextual.  He does not dispute that he arrived late to work and then left work early without getting Brosa's permission to leave.  He states, however, that his speech was not slurred.  Exhibit A (Doc. #48-2) at 3.  Viewing all factual disputes in the light most favorable to plaintiff, this raises a genuine issue of material fact whether defendant fabricated one of its two primary reasons for suspending plaintiff.  Even though plaintiff violated defendant's policies by missing work without permission, on this record plaintiff has provided just enough evidence that a reasonable factfinder could rationally find defendant's legitimate reasons for suspending him to be unworthy of credence.  See Townsend, 294 F.3d at 1242 (citations omitted).  Plaintiff has met his burden of showing pretext and the Court therefore overrules defendant's motion for summary judgment on plaintiff's retaliation claim based on Event 11.

### 2.   Events 12 and 13 (Proposed Removal and Termination of Employment)

In Events 12 and 13, Cline issued a proposed removal and Klopfer issued a notice of termination for plaintiff, based on three grounds: (1) failure to follow supervisor's instructions to stop referring endoscopies to surgeons, (2) being AWOL on September 22 and 30, 2015 and (3) failure to follow proper leave procedures on September 22 and 30, 2015.

---

(. . . continued)

retaliation claim but does not suggest that defendant suspended him in circumstances that which give to an inference of discrimination.

Defendant argues that as a matter of law, plaintiff fails to state a prima facie case of retaliation for Events 12 and 13.  Defendant raised this argument for the first time in its reply brief and therefore waives this argument.  See Water Pik, 726 F.3d at 1159 n.8.  The burden to establish a prima facie case, however, still rests with plaintiff.  While plaintiff makes little effort to show a causal connection between the termination of his employment and the filing of his EEOC complaint or his union grievance, defendant terminated plaintiff's employment in part because plaintiff repeatedly attempted to lighten his endoscopy workload by referring endoscopies to surgeons.  The record shows that plaintiff complained in his union grievance and EEOC complaint that his supervisors discriminated against him in part by refusing to lighten his endoscopy workload.  Construing the record in the light most favorable to plaintiff, these circumstances raise a genuine issue of material fact whether a causal connection exists between the termination of plaintiff's employment and plaintiff's union grievance and/or EEOC complaint.  For summary judgment purposes, plaintiff has therefore established his prima facie case.

Defendant argues that grounds (1), (2) and (3) constituted legitimate, nondiscriminatory reasons for terminating plaintiff's employment.  Plaintiff responds that these reasons were pretexts for retaliation because Klopfer, the deciding official, improperly conferred with Cline about the proposed removal.  Cline testified that he discussed the removal with Klopfer, while Klopfer denied this.  The parties agree, however, that it would have been improper for Klopfer to confer with Cline about the removal.

While evidence that defendant acted contrary to a company policy or practice can establish pretext, the ultimate question is whether plaintiff has discredited defendant's stated reasons for adverse employment action by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find them

unworthy of credence." <u>Townsend,</u> 294 F.3d at 1242 (citations omitted).  Construed in the light most favorable to plaintiff, Cline and Klopfer improperly discussed plaintiff's removal.  Even so, this does not automatically mean plaintiff has discredited defendant's stated reasons for terminating his employment.  Plaintiff does not dispute grounds (2) and (3): he was AWOL on September 22 and September 30, 2015 and he failed to follow proper leave procedures on those days.

As explained above, plaintiff raised a genuine issue of material fact whether ground (1) was pretext for <u>discrimination</u> based on plaintiff's evidence that he had a heavier workload than his similarly situated white, female colleague.  Plaintiff makes little effort in his brief to argue that ground (1) was also pretext for <u>retaliation</u>.  Construing the record in the light most favorable to plaintiff, however, the fact that plaintiff complained in his union grievance and EEOC complaint that his supervisors discriminated against him in part by refusing to lighten his endoscopy workload raises a genuine issue of material fact whether defendant's true reasons for terminating plaintiff were (1) discrimination <u>and/or</u> (2) retaliation against plaintiff for complaining about that discrimination in his union grievance or EEOC complaint.  Plaintiff has therefore alleged sufficient facts that a reasonable factfinder could rationally find defendant's stated reasons for terminating plaintiff's employment to be unworthy of credence.  Because plaintiff has met his burden of showing a genuine issue of material fact with regard to pretext, the Court overrules defendant's motion for summary judgment on plaintiff's retaliation claim based on Events 12 and 13.

**IV.    Hostile Work Environment**

Plaintiff argues that defendant created a hostile work environment on the basis of race, national origin and sex and because he engaged in protected activity by filing an EEO complaint.[14] Plaintiff bases his hostile work environment claim on Events 1 through 13, as with his other claims. In addition, plaintiff argues that other physicians of color experienced a pervasive racially discriminatory work environment.  Defendant argues that plaintiff has produced no evidence of harassment because of race, national origin, sex or protected activity.

To establish a hostile work environment under Title VII, plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule and insult, sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that he was targeted for harassment because of his membership in a protected class or because of protected activity.  Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007).   To determine whether a hostile work environment is sufficiently severe or pervasive, the Court looks to the "totality of the circumstances," and considers such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Chavez v. New Mexico, 397 F.3d 826, 832–33 (10th Cir. 2005) (citations omitted).

To support his argument, plaintiff provides statements from three doctors employed by the Eastern Kansas Health Care System: (1) Rafael Montecino, a Hispanic male physician working

---

[14]    Despite plaintiff's failure to exhaust administrative remedies for Events 3 and 4, the Court considers Events 1 through 13 in evaluating plaintiff's hostile work environment claim. Morgan, 536 U.S. at 118 ("In order for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment.").

for the Leavenworth VA Medical Clinic; (2) Mahoua Ray, an Indian female physician who supervised Beebe in the Topeka VA Medical Clinic; and (3) C.N. Krishna, an Indian male surgeon employed at the Topeka VA Medical Clinic whom Beebe supervised during her tenure as Assistant Chief of Surgery.  Defendant argues that the statements of Ray and Montecino are not based on personal knowledge and that the Court should not consider them.

Montecino works at the Leavenworth VA Medical Clinic, which is part of the Eastern Kansas Health Care System.  Klopfer is the Executive Director/CEO for the entire Eastern Kansas Health Care System and Montecino asserts personal knowledge about the "agency director" as well as other supervisors who appear to work at both the Leavenworth and the Topeka locations. He had multiple interactions with Cline and Brosa.  Exhibit N (Doc. #48-15) at 2–3.  Ray also worked primarily at the Leavenworth clinic but visited the Topeka clinic regularly to meet with plaintiff and Beebe.  Both witnesses therefore have personal knowledge of the environment at the Topeka Clinic and the Court will consider their statements.

Montecino told an EEOC investigator that the Topeka VA Medical Center was a "toxic" and "awful" place to work where supervisors discriminated and retaliated against foreigners in general and plaintiff specifically.  He stated that supervisors asked plaintiff to do more work than surgeons, who "did very little," and that foreigners would "get the stick" but their Caucasian colleagues would not.  Id.

Ray told an EEOC investigator that, in assigning plaintiff most of the cases in the operating room, defendant discriminated against plaintiff on the basis of race, national origin, sex and protected activity.  Exhibit K (Doc. #48-12) at 2.  She also stated that she believed "there was discrimination in the facility toward foreigners because about seven foreigners left the agency during her time working there because it was a toxic and stressful working environment."  Id.

44

Krishna wrote a letter to his supervisor on April 11, 2014, complaining that Beebe—who at that point was Assistant Chief of Surgery at the Topeka clinic—diverted most of the surgical workload in the clinic to him.  He stated that the situation was "discriminatory and harassment by an immediate supervisor."  Exhibit L (Doc. #48-13) at 2.

In addition to this third-party evidence, plaintiff has established that (1) he experienced a much heavier workload than Beebe, while his supervisors discouraged him from lightening his workload by sending cases to private clinics; (2) he filed a union grievance and complained to his supervisors that Beebe's behavior towards him was discriminatory and hostile, and his supervisors did not address his concerns; (3) his coworkers treated him coldly after he filed the union grievance, Beebe angrily confronted him for filing the grievance and he soon began receiving multiple traffic citations under suspicious circumstances; and (4) his supervisors subjected him to escalating reprimands that culminated in his termination and defendant violated its own procedures when deciding to terminate his employment.

Viewing the evidence in the aggregate and in the light most favorable to plaintiff, plaintiff has established a genuine issue of material fact whether defendant subjected him to a hostile work environment based on race, national origin, sex and/or protected activity, and whether defendant's conduct was so severe or pervasive to alter the conditions of his employment and create an abusive working environment.  The Court therefore overrules defendant's motion for summary judgment on plaintiff's hostile work environment claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #46) filed June 17, 2022 is **SUSTAINED IN PART and OVERRULED IN PART**.  Defendant is entitled to summary judgment on plaintiff's Title VII discrimination claims based on Events 1–7 and 9–11; and plaintiff's Title VII retaliation claim based on Events 3–10.  Defendant's Motion

for Summary Judgment is **OVERRULED** as to plaintiff's Title VII discrimination claim based on disparate workload and Events 8, 12 and 13; plaintiff's claim that defendant retaliated against him for filing a union grievance based on Events 1, 2, 12 and 13; and plaintiff's claim that defendant retaliated against him for filing an EEOC complaint based on Events 11, 12 and 13.  Defendant's Motion for Summary Judgment is **OVERRULED** as to plaintiff's Title VII hostile work environment claim.

The following claims therefore remain for trial:

1. Plaintiff's Title VII discrimination claim based on disparate workload and Event 8 (Written Counseling), Event 12 (Proposed Removal) and Event 13 (Termination of Employment);

2. Plaintiff's Title VII retaliation claim based on the union grievance regarding Event 1 (Alteration of Hospital Records), Event 2 (Traffic Citations), Event 12 (Proposed Removal) and Event 13 (Termination of Employment);

3. Plaintiff's Title VII retaliation claim based on the EEOC complaint regarding Event 11 (AWOL and Suspension), Event 12 (Proposed Removal) and Event 13 (Termination of Employment);

4. Plaintiff's Title VII hostile work environment claim.

Dated this 15th day of November, 2022 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge